Case No. 16-1234-NL Advanced Energy Management Alliance Petitioner v. FEDERAL ENERGY REGULATORY COMMISSION Mr. Elliott for Petitioner APPA Ms. Desirmieu for Petitioner NRDC Ms. Banta for the Respondent and Mr. Price for the Intervenors May it please the Court, I will reserve three minutes of my time for rebuttal. I will address the threshold question of whether FERC violated Sections 205 and 206 of the Power Act, the first issue in the brief. Ms. Desirmieu will address the next two issues in the brief, whether the costs and benefits of PJM's proposal and about FERC's finding that the proposal was not unduly discriminatory. Petitioners have agreed to rest on the briefs on the remaining issues, although counsel presenting those issues are present here in the courtroom to address them if needed. So the common thread in all these appeals is that PJM rushed to assemble its capacity performance proposal and FERC rushed to approve it, ignoring any alternative proposals to ensure reliability, despite the proposal's high cost to consumers, its discriminatory effect on certain capacity resources and other flaws. Now, it's undisputed that PJM did not have the authority to make all of these changes unilaterally by filing them under Section 205 of the Power Act. That's why they filed the Section 206 complaint. The proposal was, in fact, so controversial among the stakeholders that PJM did not even try to get the support they needed to file it unilaterally under 205, and so they elected to file this Section 206 complaint along with the other tariff changes they filed under Section 205. And FERC went along with that, but its contradictory two-step analysis, I think, ran afoul of the statute and undermined the legal basis for its findings. Now, FERC said that the unilateral tariff changes that PJM had made were just and reasonable. But then it turned around and said, well, because you did those, you've rendered your operating agreement and some other provisions in your tariff unjust and unreasonable. Now, how could those both be true at the same time? So then they turned around and granted the complaint and said, in light of the changes that you've made unilaterally, we have no choice but to grant your complaint. And then FERC ordered certain changes to the operating agreement and to the tariff that were sought in the complaint, not all of them, but most of them. So in the end, PJM was able to unilaterally implement nearly their entire proposal through this mechanism and through the way FERC allowed them to do it. Now, in other words, what we're arguing here is that PJM essentially created the statutory unlawfulness in its tariff and FERC then remedied it at PJM's behest. Now, that vitiates the burdens of proof under both statutes. They didn't show that their proposal was just and reasonable because it actually made some other parts of their tariff that they couldn't change legally unjust and unreasonable. And the finding that the complaint should be granted was sort of a fait accompli at that point because they'd already accepted the other changes. So this blurred the lines, in our view, between sections 205, lines that this court has uniformly vigorously enforced and reversed FERC on numerous occasions. We cited the Western Resources cases as a prime example. This is like getting to the five-yard line and having the referee push you over the goal line or hitting a triple and having the umpire wave you home. That's just not the way the statute was designed to do that. PJM did not meet its burden of proof under either statute. Now, think about the reasoning that FERC employed to reach this result. They said, well, we can grant the section 205 complaint and ignore the, sorry, we can accept the 205 rate changes to the tariff and ignore that Nelson complaint over there in the corner. But then next they say, but when we look at the complaint, well, we can look at the rate changes that they've made because we have to consider them together. I mean, that kind of contradictory reasoning, I think, is the epitome of arbitrary and capricious agency decision-making. These provisions were simultaneously before the commission. PJM admits they couldn't unilaterally implement the whole thing, and yet FERC allowed that to happen. Now, this is not just kind of a gotcha here, a narrow technicality, because as this court has again recognized, 205 and 206 envision much different processes, different burdens of proof, and it's incumbent upon the agency when acting under 206 to justify its proposal, just like it was ordering the whole thing into existence of substanti. It's agency action under 206 that makes the rate changes. It's not PJM's proposal that has some vaulted status. I mean, so this procedural error, in other words, I think, had real practical consequences. It abbreviated the scope of the proceeding because FERC can now pretend we're just looking at PJM's proposal. We don't need to consider any alternatives. That's what they actually held on rehearing in paragraph 37 of the rehearing order at page 1471 of the Joint Appendix. We don't need to look at alternatives because this is a 205 case, but it wasn't even by their own lights and certainly not under any regular implementation of the statute. In our view, because FERC should have acted under 206, it should have held a hearing. I mean, this is actually what PJM did, I mean, FERC did, when they first looked at this reliability pricing mechanism back in 2006. Those are the orders that this Court upheld in the Maryland Public Service Commission case in 2011 that's cited in the briefs. There they held a hearing, a paper hearing, and got everybody together. It was a settlement. They negotiated something that worked. It was filed. It wasn't approved. It wasn't happy. Everybody wasn't happy with it, so there was an appeal, but it was upheld as being a reasonable process, and FERC assembled a record after listening to various alternatives and various people's proposals, and the proposal got modified as a result of that process. That didn't happen here. We didn't have to look at any alternatives as FERC's holding. So FERC's defense here is that we're letting the 206 tail wag the 205 dog, and they should have freedom under the statute, under Chevron, to do this. Well, there's no ambiguity in the statute. They pointed to it and allowed them to do this. In fact, it seems to clearly violate the statute on its face. So if there's any Chevron analysis to be applied here, I think it's certainly step one of Chevron. Now, FERC says we can't deny PJM the unilateral right to make tariff changes, and they cite the Atlantic City case, and that's black letter law, but that's not what happened here. PJM didn't have the unilateral right to make all these tariff changes. But they did have, at least I'm trying to understand this, but I think they had the unilateral right to make the tariff changes that they submitted to FERC, right? They just left some off, the ones that they couldn't make unilaterally. That's correct. That is correct. So I think FERC could look at that proposal, institute a 206 proceeding, which is what they did back in 2006, and consider a PJM proposal. It's not like it gets thrown out the window. So how would that be different from what happened here? I mean, in other words, if they could submit what they submitted under 205, and FERC initiated the 206 proceeding, you wouldn't have a problem with that, right? No, because, well, if FERC actually would hold a paper hearing and hold some more procedures and listen to alternatives, but that's the sticking point here. They said we're only going to look at PJM's proposal. We're going to ignore alternatives because we have no legal obligation to consider them, which is black letter law under 205. We're not disputing that. I'm just trying to understand what the sticking point is here. The sticking point really is process. It's too narrow and too close. What I'm trying to figure out is even if FERC initiated a 206 proceeding, let's say that PJM didn't file those complaints simultaneously. It just filed what it could under 205. And FERC then said, okay, because of that we need a 206 hearing. Could they have done it the way they did it? In other words, without this broader hearing. Well, but they typically, well, no, I don't think they could because the 205 finding wouldn't be sustainable that it was just unreasonable because it created these other problems that they had to remedy under 206. So I think the 205 finding was arbitrary and capricious given the way FERC held that the two things were so closely linked. You could do one without the other under FERC's judgment. PJM suggested you could, but that's not what FERC held. So I'll reserve the rest of my time if there are no immediate questions. Okay, thank you. Thank you very much. Good morning, Your Honors. Catherine DeSorma for the Natural Resources Defense Council. As my colleague, Mr. Elliott, explained, PJM's capacity performance proposal works a major overhaul of the capacity market. It changes the system of penalties and incentives. It changes how performance is evaluated. And it replaces all the existing capacity products with a single product called capacity performance, which requires an annual commitment to provide the same level of capacity any time when called on, any day of the year, any time of day. Now, PJM has acknowledged from the outset that this proposal will increase costs on consumers, but it did not support its final proposal with any evaluation of the costs. Indeed, the only evaluation of costs that PJM supported was a draft four-page long preliminary analysis of PJM's draft proposal. Nor did it offer any estimate of what the costs might be, and it didn't attempt to evaluate the value of the reliability benefit. That was the purpose of the capacity performance proposal. So when FERC says in its rehearing order that, quote, costs are an important part of our determination at page 1467, we don't know what the content of that determination is. We don't know what the costs FERC thought would flow from capacity performance. And when FERC says in the rehearing order that the benefits that capacity performance would yield are, quote, significant and, quote, justify the costs at 1469, again, we don't know what that means because neither PJM nor FERC made an attempt to quantify or value those benefits. Now, our argument is not that every time a utility changes its tariff that it needs to provide a cost-benefit analysis, but it does need to provide some sort of content to the costs on one side and the benefits on the other so that FERC can weigh them and determine whether, indeed, the costs that that change will yield are just and reasonable. FERC didn't do that here. It asserts only conclusorily that the costs will be outweighed by benefits, but we have no way of knowing what FERC thought that was. The only thing FERC cites, too, in the record regarding costs and benefits is the Schnitzer affidavit, the affidavit that Exelon supported in support of its protest, its partial protest. But, of course, the Schnitzer affidavit is evaluating the benefits that will flow from a different proposal, the proposal that Exelon was advocating, which involves multiple changes to the capacity performance model. So for FERC to rely on an affidavit that, in fact, says repeatedly that if PJM does not fix its proposal, these benefits will not materialize, that is the height of arbitrary and capricious decision-making. I want to be clear, too. Reliability is fundamentally important, and everyone before the Court here agrees that that is a fundamental critical aspect of the capacity market. But PJM saying that PJM's goal is the right one is not the same thing as making a reasoned decision and pointing to evidence in the record supporting that that goal is going to be met here and that it will be met at a reasonable cost. FERC needs to explain why is it citing the Schnitzer affidavit, for example, why isn't it citing contrary evidence in the record like the LaCapra analysis, which directly critiques the Schnitzer affidavit. That's at Joint Appendix 845. FERC needs to explain what is this benefit that we are purchasing. As then-Chairman Bay explained in both of his well-reasoned dissents, we simply know that we will be purchasing some more expensive capacity under these new rules that go into effect in May of this year, but we don't know what we're buying. I want to note, too, that although FERC and respondent-intervenors suggest that the fact that there's an auction mechanism here somehow relieves FERC of its duty to determine that the rates will be just and reasonable, that is incorrect. This Court has never held that the fact that there's an auction mechanism as opposed to an out-of-market mechanism means that FERC doesn't need to do the 205 analysis. The rates will be just and reasonable. Indeed, it does. And, in fact, FERC and this Court repeatedly, when reviewing auction mechanisms, does do that analysis. So, for example, in the earlier PJM case that my colleague Mr. Elliott cited, that's PJM Interconnection 117, FERC 61066 from 2006 that's cited in the briefs. When PJM first put together the reliability pricing model, the original capacity market, it supported that proposal with cost-benefit analyses, and it showed under the status quo, here's the reliability that we will achieve. PJM has a reliability standard. It's the one event in 10-year loss-of-load expectation. And they showed under this new proposal, here's the reliability benefit we can expect to get. We don't have anything like that here in this record, Your Honors. And so for that reason, we believe that FERC's orders must be vacated. There is no substantial evidence to support its determination that the rates are just and reasonable. I see I'm close to the end of my time. I'd like to reserve two minutes for rebuttal. But before I close my opening, I do just want to say a word about discrimination against seasonal resources. Now, no one here seriously disputes that seasonal resources like wind, solar, and demand response will be adversely affected by the move to 100% capacity performance. Historically, under the reliability pricing model, that's the old capacity market, seasonal resources did participate. They provided effective capacity and contributed to a more diverse, more cost-effective system overall. They are currently still participating in this transitional period as base capacity. Base capacity is the legacy product that PJM created to be present in the market up to 20% during this transitional period. But base capacity will be eliminated in May of this year, and seasonal resources will have no way of participating in the market as seasonal resources after that. Does the Commission's treatment of aggregation speak to that problem? It does, Your Honor. But aggregation, we believe, is an ineffective alternative to being able to bid into the market as a stand-alone resource. It's extremely difficult and inefficient for individual resources to try to find other resources with complementary availability in the same locational deliverability area. It's a burden that annual resources don't need to bear. Do you understand what FERC's explanation is as to why aggregation can include only the seasonal resources and not the traditional resources? Well, that's an argument that the American Municipal Power Inc. has made, that that is a discriminatory determination as well, Your Honor. My client, Natural Resources Defense Council, didn't present that argument. I understand that. Yeah. I'm not sure where I was supposed to pick that net since the party divided that up the way they did. Right. It's a net that I wouldn't say jumped out at me, but I at least noticed that I'm not sure what the Commission's understanding is as to why aggregation is good, but aggregation that includes traditional resources is not good. That's right. I think in part it's a recognition by FERC and by PJM that seasonal resources, specifically wind, solar, demand response, renewable and clean technology resources are going to be adversely affected in ways that other resources are not. But I also think it is obviously a very burdensome process that annual resources don't have to go through. And I do want to note, I'm seeming to my rebuttal time, but I just want to note the nature of demand in PJM is seasonal. There's a winter peak. There's a summer peak. Now under capacity performance starting in May, unless this court acts, PJM will procure a uniform level of capacity all year round, which involves over procurement of capacity in the off-season months and potentially under procurement in the peak months. We don't believe that's just and reasonable. We don't believe it's rational or supported by the evidence, and it will disadvantage seasonal resources. With that, I'll leave the rest of my time for rebuttal unless the court has further questions. Thank you. Good morning. I'm Carol Banta for the commission. I think I'll begin with that last point, the aggregation question. The reason, starting with Judge Santel's question about why the market doesn't have aggregation for conventional resources as well. The commission found PJM was coming up with a new capacity performance product, but it was starting with the capacity options it already had, and it has not had a portfolio bidding approach. It's had a resource-by-resource approach. PJM did not want to change that, and the commission did not find that it was discriminatory against conventional resources to stick to that. It made an exception for not just seasonal. There are other intermittent certain demand resources, energy efficiency resources. I don't actually know the definitions of all of those, but there were a number of categories of resources that the commission approved. An exception, a reasonable accommodation for resources that a conventional resource, if it's unable to perform, if it's unable to guarantee its performance, it can fix something. It can upgrade its equipment. It can firm up its fuel arrangements. It has options, and actually this entire market proposal is to put those risks and those decisions on suppliers. If you have a wind farm, you can't order more wind. So the commission agreed that it's a reasonable accommodation for resources that couldn't improve their performance just by making investments to allow them to still participate in this market. So that's why it was- To allow them what? To aggregate. Yeah. Now, would it be possible, and I'm maybe asking for something that isn't, to have an aggregation that included traditional and seasonal resources in the same aggregate entity? I believe it would be possible, but it would become more of a portfolio approach that PJM did not propose and the commission- But PJM is not supposed to be dictating the terms here, and if FERC thinks that that would alleviate a discriminatory feature or make things more efficient, couldn't FERC say, no, we're not going to approve this unless you modify it to allow cross-aggregation among traditional and seasonal resources? Of course it could. The commission- Okay, then I'm getting to the point of asking, why didn't it? Because it did not find it unduly discriminatory. It found that it was reasonable to- It didn't say much about why it was reasonable. I don't think you got a very- Well, I mean, the emphasis, as with the- Is it tolerably terse, or is it just not there? Well, there were so many issues. It did address it, but not in great length. But it is consistent with the overall- Again, this is about capacity resources that in the past bid into the market but did not take responsibility for whether they would actually show up when they were needed, and that's what this whole revision of the market is about. And the commission said, if you can't perform reliably, fix it, or maybe be priced out of the market if you can't fix it. If you're a conventional resource, you can fix it. Traditional resources don't have the same opportunities to fix. Exactly, and that's why aggregation was- Yeah, I can understand why aggregation would then be a good thing, but would it not be a better thing if they were permitted to cross-aggregate with traditional resources? No, I think the commission didn't decide whether it would be better or not. It didn't find it discriminatory against the conventional resources in a manner that had to be- Did any party suggest the idea of cross-aggregation? Well, yeah, American Municipal Power did argue that it was discriminatory against conventional resources not to allow them to aggregate, and that's where the commission- And now I'm losing the page for that, but- But a combination of traditional resources and then renewable resources, did anybody propose that as aggregation? I think that that was part of American Municipal Power's argument, yes. And I think it's just that the commission found that conventional resources don't have this built-in disadvantage that certain intermittent resources do. I need to ask you about something that- There are many things in this case, I don't fully understand, but this is one of them. The complaint against aggregation was something that you couldn't do it across delivery areas? Is that right? Right, and with that- What exactly is a delivery area? And second of all, why wouldn't they be allowed to go across delivery areas? Well, they might be. They weren't here because the commission found that when PJM, mid-proceeding, said, well, we could do that, it didn't provide the level of detail that the commission needs to approve that. That could still happen. I don't know if a further filing has been made on that. There are, if I remember correctly, 24 different pricing zones within the PJM region. And it gets really complicated, but they're regional areas that have different transmission constraints, different demands, so pricing is actually done separately in a way that- I don't know if I can give you a sophisticated description, but the pricing is done differently for 24 different zones. And the auctions, I think, operate- I'm getting a little ahead of myself on this. I know there are 24 pricing zones- Let me ask, let me just follow up. Is it accurate to say that the problem that the petitioners identify with aggregation is that wind farms may be in one delivery zone and solar in another, and they're not all- the different varieties that you would need to aggregate and have 100% are not all in the same delivery zone for one reason or another. I don't know why. I think that may be. I don't know what- the problem is, of course, the seasonal resources, the parties, did not articulate any of this on re-hearing. It is true that the cross- not LV, but the pricing zones. The cross-zonal issue was raised, I believe, by American Municipal Power, and that's the context where- so it wasn't about the burden on a wind farm. I think the commission left open the possibility, and PJM has expressed willingness to do that, but it wasn't there in this proceeding to explain some of the pricing differences, the performance measurements of- since these pricing zones are treated separately, doing something across the pricing zone requires a bunch of rules about how are we going to measure the performance, et cetera. I'm now remembering something that addressed your point, but I think it was in one of the filings and not one of the orders, so I don't want to get ahead of myself. But the commission didn't rule it out on the cross-zonal stuff. It just said it needs to be better supported by PJM for us to be able to approve it. That's all. But I do want to be clear, another thing about the seasonal resources, it is not true that seasonal resources cannot participate in the performance market unless the aggregation. The commission made clear numerous times that they can submit a stand-alone offer. The thing is, like all other sellers, if they did that, they have to be able to be responsible for their own performance. So what it might mean, and the commission addressed this in the orders, is bidding in their average performance over the course of the year. Yes, that's going to be probably significantly less than their full, what we call nameplate capacity. If you have a 100-megawatt wind farm, they're not going to be able to bid in the whole 100 megawatts because they know they can't. They can't meet that all year. But let's say they can make 30. They can still participate as a stand-alone resource even without the aggregation. But they would participate at a much lower level than would have been the case before PJM provision. Because in this market, capacity resources were able to bid in at numbers that they had no intention of meeting or couldn't meet. The incentives weren't aligned. What the commission is saying, and the commission also made clear, that's just their capacity revenue stream, their capacity participation. Let's say they bid in at 20 megawatts as a capacity revenue, but an emergency condition comes up and they're actually performing at 80. They're getting bonus performance payments in the energy markets for overperforming at that 60. And all of these resources, but the seasonal ones in particular, who emphasize we're great at the peaks, but we can't guarantee it year-round. The commission said capacity performance needs to be someone who guarantees that they'll show up when they're needed. And no one knows exactly when that's going to be. Yeah, it tends to be at the peaks, but emergencies happen, and we need to know that capacity suppliers have done what they need to do to be able to show up. But some won't. They will incur penalties. And that's when those who are selling into the energy market, either not as capacity suppliers at all, they're just doing the energy market, or the ones who other resources don't have the option. This is a special option for these intermittent resources. If you have a 100-megawatt gas-fueled facility, I think you're supposed to, as I understand it, you're supposed to bid the entire thing. They have the option to say we think we can do 20 and we'll get the capacity revenues for 20, but when there's an emergency and there's a lot of wind, we come to the rescue and we scoop up all of these bonus performance payments in the energy market, and they absolutely still have that. So it's not at all correct to say that they're out of the capacity market entirely. It's certainly not that they're out of the energy market entirely, and that's why I would dispute that we do not agree that they would necessarily be adversely affected. We do agree that they have to put in a capacity performance bid that they can meet and take responsibility for the penalties that apply if they don't. But these orders and PJM's filing made clear there are plenty of opportunities for them as well, and there are special exceptions. As much as they say that it's been discriminatory against them, they have a special exception that they get to bid in at less than their full capacity as a standalone resource, and they have a special provision that they can aggregate. But when it comes to capacity performance resources, the commission said it was reasonable to expect every supplier to perform all year regardless of technology type, and that language, regardless of technology type, was actually echoing exactly what was done in the ISO New England capacity market as well, the regardless of technology type. So this, to start with the first principles in these orders when we're talking about the cost-benefit analysis, the commission started at paragraph 5 in the very first order on JA1000. The last sentence in paragraph 5, PJM adds, and we agree, I'll paraphrase, I won't read it, but a resource adequacy construct that doesn't properly incentivize performance not only threatens reliable operation, it forces consumers to pay for capacity without receiving commensurate reliability benefits. And the commission went on from there in both the first and the second order to talk about that the existing capacity market did not have the incentives aligned properly, and consumers were already paying for reliability that they weren't getting. When we had the polar vortex isn't the be-all, end-all of everything. It's one, what's the word I'm looking for, a conflation of events that really showed a number of weaknesses in the system, and it showed that we were already paying for reliability that we weren't getting. And the entire purpose and the reason the commission approved this proposal, and it talks at great length in both orders about the market forces, the market dynamics, the economic principles of aligning incentives, putting the risk on suppliers to assess what do they need to do to perform and make them reliable, stop putting the risk on load to pay scarcity energy pricing and price spikes and uplift payments when you don't show up. So when we're talking about what are the reliability benefits that customers are getting for what they're paying, it's also in the context of what they were getting and not getting before. So this market is about putting the incentives where they need to be, and it may be that it costs more, at least at the outset. That happened with the capacity market as well. This court saw that in the Maryland case, that the price signaling brought in more capacity. It did succeed at that. This is about putting the risks of performance and nonperformance where it belongs. That sends investment signals. Suppliers will invest in their resources to make sure they can perform. The ones that can't cut it will eventually leave the market and make room for the ones that can. And customers are paying for reliability that they're actually getting. And the commission proceeded from that, and that is something that those challenging the cost-benefit analysis have never really grappled with. Yes, you might be able to fix the problems in the short term so that the lights don't go out the next year, but what happens five years from now when we have more natural gas fuel resources? And who's responsible for making sure that they show up when they're needed? It could be in the summer peak. It happened in a winter peak, but that's not always going to be the case. And that's really where all of this was coming from. Talking about the cost-benefit analysis specifically, and again, you can't just look at a couple paragraphs and say that that was the sum total. After explaining everything about the market dynamics and putting risk where it belongs, the first dozen or so paragraphs in the first order. In the second order, I think paragraph 23 and forward, before we even get to, okay, we will try to attach some dollars to reliability benefits, which are difficult to do. PJM hadn't tried to do it in the analysis that it submitted. Its analysis it had submitted really just tried to show cost benefits in the energy market in terms of price spikes and uplift payments. So, yes, the commission looked at the Exelon testimony where someone tried to actually attach some numbers to what reliability is worth. The commission also said it didn't have to quantify. It doesn't, but it did at least say, look, somebody has tried to put a number on this, and this is in line with what we've been saying. But, no, the commission didn't think it needed to. But it did in the interest of considering all of the arguments. One other thing I want to address, since we haven't discussed the 205-206 argument, this ties in with that, actually. Paragraph 50 in the first order, yes, which is at JA-10-15. That is the place where the commission did, there are particular ones in other places with regard to the 30 hours and another issue that wasn't even raised here where the commission looked at alternative proposals and rejected them. One, I think, note 77 in the recurring order, I want to say, or maybe it's the first order. It was note 70-71, rejected doing the penalty based on a historical averaging rather than the 30-hour standard. I digress. I go back to paragraph 50 where the commission said PJM has justified its proposal under 205, but also we're unpersuaded that any of the other reforms are substitutes for this because they don't even account for the market dynamics and the economic principles that we've been talking about. They're a short-term fix, but they don't deal with the misalignment of incentives that got us to where we are. Did PJM admit in its answer that the 30 hours was, that there might be a better? No. If you look at the, I forget where that page is, but if you look at the actual wording, they say we still think 30 hours is what we want to do, but we would be willing to do this three-year rolling average. It has its merits too. And that's what the commission said, and I'm going to find that page for you now. The commission did reject that. JA 1484, it's note 77 to paragraph 71 in the rehearing order. Maybe it's a little oblique, but it says we don't think the estimate should be determined exclusively by historic averages. That's what the three-year rolling average proposal was. So PJM acknowledged there was another way of doing it. The commission chose the 30-hour, recognizing this is a new market, this is a new standard. We don't know if this is the right number, and that's why we're going to look at it. We're going to have it reassessed. We want annual reports, and we're going to look at whether it needs to be adjusted. The 30 hours represented the number of hours per year that emergency conditions would arise? A projection, yes. And what it was based on. Like what, power outages? Well, emergency conditions are a tariff definition that go way beyond that. In fact, this is a stricter standard than ISO New England had. You're not actually at an emergency, but you can see one coming, and you're taking steps to avoid it. It's a very technical definition, but it is a particular tariff-defined condition that we can identify, and those would be the performance assessment hours. And if you look at paragraph 70, which is on JA 1483, the commission said this did arise from the 30 hours that there actually were in 2013-14. I thought it was 26 hours. Hmm? I thought it was 26 hours, not 30. It was 30 in 2013-14. But the commission also noted evidence that, again, going back to the zones, the different pricing zones, sometimes a zone has an emergency condition, even if the entire region doesn't necessarily. So the evidence showed that in both 2010-11, because these are May through May years, and 2013-14, a number of zones experienced more than 30. The numbers were 34 to 49, 37 to 62. So there had been zones that experienced even more than 30. So going forward with the change in the resource mix and the unpredictability of weather, the commission thought 30 was, as it put it in paragraph 73, a reasonable middle ground. You're not always going to hit 30. Sometimes you're going to hit more. If that turns out not to be the case, it can be adjusted. But it was a well-supported, reasonable, deliberately chosen middle ground that won't be hit every year, but if it isn't being hit at all, it will be changed. And the commission acknowledged that that was experimental. One other point I did want to make. Of course, no party in this proceeding has challenged the energy market rule changes that were made pursuant to the 206. So that's not even in front of the court. Nothing in those changes. So if someone wanted to argue that you couldn't find something unjust and unreasonable under 206 because of this significant market reform, I think you could. It would be an interesting argument, but it's not in front of the court. You won't find any suggestion in these orders that the commission premised its approval of the 205 filing on the 206 changes that it made in the same order. And it started, again, going back to the very start, paragraph 4 in the first order. Today's order approves as modified significant reforms to the capacity market construct and corresponding changes to the market rules. So this appeal is about the 205 market proposal, which is significant, but it's exactly the kind of thing that this and other courts have approved in the past, and the commission did a full 205 analysis. And as the commission noted, the commission did not interpret the Federal Power Act as taking away the right to do that because of some corresponding changes to the market rules that, again, aren't challenged here. If the court has no further questions, thank you very much. Thank you. Your Honor, and may it please the court, Matthew Price on behalf of Respondent Interveners. What I'd like to do, if I may, is just quickly address Judge Randolph and Judge Santella's questions on aggregation. One of your questions, Judge Brown, on 205 and 206, and then hopefully spend the bulk of my time addressing the cost-benefit issues. Judge Randolph, you asked about intrazonal aggregation, and the reason why that is not permitted is because the zones are set up based on transmission constraints. So if you had a near outage in one zone and you had some other resource in some other zone, it wouldn't necessarily be able to deliver energy to the place that was suffering the system stress. That's the reason why. Judge Santella, to your question about aggregating with traditional resources, FERC addressed this in paragraph 102 of the tariff order. And there are basically two reasons. The first is PJM's market has always been based on unit-specific bidding. That's always been the case. And one of the reasons why that's the case is because if you allow portfolio bidding, it creates the opportunity for the potential exercise of market power as companies are able to essentially withhold some of their capacity from the market by linking their generators together in an aggregated bid. And that's one of the reasons why, as FERC explained in that paragraph, it didn't want to allow that kind of aggregation for resources that would be capable of actually making the investments needed to meet the capacity commitment that they had signed up for. Now, Judge Brown, with respect to your question on 205, 206, you asked whether if FERC had initiated the 206 filing on its own, whether that would have been okay. And opposing counsel answered that it wouldn't have been. And the rule he seems to be advocating for is that if a Section 205 filing necessitates any change to any other tariff, that the 205 filing needs to be rejected. And this Court's cases flatly reject that rule. If you look at the Public Service Commission of New York case and the C. Robin case that we cite in our brief on page 18, and that the petitioners do not reply to at all in the reply brief, what those cases hold is that when FERC is reviewing whether a tariff is just and reasonable and discovers in the course of that review that another tariff needs to have conforming changes made to it, it can require those additional changes to be made so long as it satisfies the applicable burden under Section 206. That case involved the Natural Gas Act, but it's parallel statutes. Okay. I understood Mr. Elliott to say that the problem was that the Commission did not meet the applicable burden. Am I misunderstanding his argument? Well, I don't – you'll have to ask him. But if that is his argument, it would be a strange argument because the petitioners don't challenge the 206 finding at all. They don't complain about it, and, indeed, one would question whether they even have standing to object to it. No one objects to the 206 changes in this case. It would be a very strange result if the law were somehow different because PJM had initiated the 206 proceeding and pointed out to FERC, hey, here are some areas where you might want to consider making some changes rather than leaving FERC to hunt around in other tariffs and identify changes that might need to be made. And I think it's notable in connection with that that, in this case, FERC actually did reject one of the Section 206 changes that PJM had proposed because it didn't find that change was warranted. If there are no further questions about those issues, I would like to spend a couple of minutes addressing the cost-benefit issue. I think it's important to focus on what FERC actually said about this issue, that the standard for this Court's review is whether FERC provided a reasoned explanation. It's allowed to consider non-cost factors, and ample deference is warranted for its technical judgments. And if you look at the rehearing order, paragraphs 31 through 35, and that's on joint appendix 1469 through 1470, FERC really walks through the reasons why this program is cost-justified. And there's one thing in particular I want to point the Court to, which is in paragraph 32, FERC says the primary purpose of PJM's capacity market is to procure sufficient capacity to meet its reliability objective, which currently is a loss-of-load expectation of one day in 10 years. That is the reliability standard. In other words, we don't want a probability of more than one outage in 10 years. That reliability standard is a bedrock principle of capacity market design that goes back many years and is true in all of the regions under FERC's authority. And when you hear petitioners complain about the cost of this program, what they're complaining about are the costs of achieving that standard. What they're really arguing to you is that standard is problematic because it costs too much and they're willing to tolerate more risk. But that standard was not litigated in this proceeding. It was not at issue, and petitioners should not be able to make essentially a collateral attack on this well-settled reliability standard by complaining about the cost of the program. Now, I also wanted to draw your attention to the page of the Exelon comments on which the commission relied. And it's page 40 of the Exelon comments. This is on Joint Appendix 438. And if the Court allows, I just want to take a moment to focus on what's on this page. Joint Appendix 438. This sets out a table of the costs and benefits of the program. The first row of the table indicates the estimated costs. And for 2018-19, which is the first full year of the program, it's $1.9 to $5 billion. And this is an estimate provided by PJM that is not contested in the case. Petitioners themselves cite it. The next row is energy market cost reductions. So these are savings that consumers will realize that offset the costs. And these are not reliability-related. These are savings in the energy market that results from having better-performing units that are not going to be out as much operating throughout the entire year. And as a result, you have more competition at any given moment and lower prices for consumers. And those benefits, and again, this is a PJM number that is not disputed, are $3 billion. So already you have benefits that are in the midpoint of the costs. I think it's within First's discretion, even before thinking about reliability, to conclude that this program is cost-justified. And then once you account for the reliability numbers, which is, after all, what the main point of the program is, you see that the net value to customers is $1 to $7.6 billion a year. This is not a close case, even remotely, where it would be appropriate for the Court to second-guess FERC's technical judgment on whether rates are just and reasonable. I see my time has expired. If the Court has no further questions. Thank you. Thank you. Mr. Elliott, you had one minute of trial time remaining. Yeah. I'd like to, I guess, respond to the argument that our 205-206 argument is kind of beside the point because we don't object to the energy market changes point that both counsel have made. My client, the American Public Power Association, has not challenged on appeal one of the energy market changes. I believe the Advanced Energy Management Alliance does actually challenge one of those energy market changes at FERC order. It's not my client. So the energy market is before the Court. I believe that is correct. I'm not their counsel, but that's my understanding from reading the brief. But the larger point is that my client, representing public power systems throughout PJM, small municipalities that own their own electric utilities, objected to this entire proposal as being too costly. So, you know, we've objected to the whole thing as being ill-considered and rushed to judgment. I mean, the best analogy I can think of would be like if you wanted to stop another winter problem, people getting stuck in the snow around DC, you could require everybody to have a four-wheel drive vehicle or you could plow the roads better. And that's essentially what this comes down to. We think a more narrowly targeted approach, targeting winter reliability, would solve this. And that's Commissioner Bay's point in his dissent. A million-dollar problem fixed with a billion dollars of cost. Thank you. Just briefly, I'd like to address the cost-benefit issue. It's true FERC spends quite a lot of time discussing the problem. It doesn't discuss with sufficient specificity the solution. Is the solution that PJM has proposed the right one? Is it going to yield rates that are just and reasonable? That's the basic requirement that FERC needs to reach under Section 205. It needs to provide a reason, determination, and tie that to evidence in the record. It hasn't done that here. My colleague, Mr. Price, notes the Schnitzer affidavit adds up the costs that PJM asserted based on what it called a preliminary analysis in that four-page cost-benefit analysis that attended its draft proposal. He adds those to the reliability benefits that he thinks the PJM's final proposal, as he would have modified it, would yield. So essentially, Schnitzer is adding apples and oranges here, and neither one of them is relevant to the proposal as FERC approved it. So to say that Schnitzer's affidavit provides substantial evidence that PJM's solution here, as FERC approved it, will yield just and reasonable rates is simply arbitrary and capricious, Your Honor. If that had been FERC's determination, it should have at least explained why Schnitzer's affidavit was still relevant, given all the changes between what FERC actually approved and what he was basing his analysis on. FERC didn't provide that explanation, so this is now a post hoc rationalization that doesn't provide a reason to affirm FERC's determination now. I will just note, we're not arguing again that FERC needs to assign a dollar number or that PJM needs to assign a dollar number to reliability. Reliability is critically important, and it can be difficult to quantify non-cost benefits, even when they're critically important to the market. But if that's the case, then PJM and FERC need to explain why it's not possible to quantify the benefit. That's what this Court held in Business Roundtable v. SEC. The Seventh Circuit held similarly in Illinois Commerce Commission v. FERC. It needs to explain how are we valuing this benefit. It needs to be transparent about it so that there's something for the Court to review. That was also the teaching of Michigan v. EPA, the Supreme Court's decision, where the Supreme Court said we're not asking necessarily for a full cost benefit analysis, but the agency needs to engage in reasoned decision making. I see my time is up. Thank you, Your Honors. All right. Thank you. The case will be submitted.
judges: Brown, Sentelle, Randolph